Mary TATARANOWICZ, et al., Plaintiffs,

v.

Louis W. SULLIVAN, M.D., Secretary, United States Department of Health and Human Services, Defendant.

Civ. A. No. 90–0935.

United States District Court, District of Columbia.

Dec. 21, 1990.

Charles C. Hulin, Center for Medicare Advocacy, Thomas C. Fox, Reed, Smith, Shaw and McClay, for plaintiffs.

Peter Robbins and Anne Weismann, Dept. of Justice (Mary Salhus and Kathy Scully–Hayes, Dept. of Health and Human Services, of counsel), for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

On April 20, 1990, plaintiffs filed this class action for declaratory and permanent injunctive relief, challenging the Secretary of the United States Department of Health and Human Services' (the "Secretary") construction of the transition provisions of the Medicare Catastrophic Coverage Repeal Act of 1989, Pub.L. No. 101–234, § 101(b), 103 Stat. 1979 (1989) (the "Repeal Act"). Plaintiffs contend that the Secretary erroneously construed the transition provisions of the Repeal Act so as to unlawfully deny plaintiffs 100 days of Medicare coverage for skilled nursing facility ("SNF") services furnished on and after January 1, 1990. Plaintiffs have moved for class certification on behalf of all others similarly situated. Plaintiffs have also moved for summary judgment.

Defendant has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that the complaint is outside the Court's subject matter jurisdiction because plaintiffs have failed to exhaust their administrative remedies and because plaintiffs lack standing.[1] On October 26, 1990, this Court held a hearing on plaintiff's motion for summary judgment and defendant's motion to dismiss.

*Background:*

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, establishes a federally subsidized health insurance program for the elderly and disabled which is administered by the Secretary. Part A of the Medicare Act, 42 U.S.C. §§ 1395c–1395i–2, provides reimbursements for hospital, post-hospital extended care, and home health care. In 1988, Congress passed the Medicare Catastrophic Coverage Act, Public L. No. 100–360, 102 Stat. 683 (the "Catastrophic Act"). The Catastrophic Act increased Medicare coverage for post-hospital extended care services in a skilled nursing facility ("SNF") from the 100 days allowed previously to 150 days during any calendar year; in addition, the new law eliminated the three-day hospital stay previously required to trigger SNF benefits. The Catastrophic Act, which was to be financed by a special federal surtax on senior citizens, was repealed on December 31,

---

1. Defendant also argues that the complaint should be dismissed for failure to state a claim upon which relief can be granted. The Court finds that plaintiffs have stated such a claim.

1989, less than one year after it was instituted.

The Repeal Act was enacted on December 13, 1989 and was made effective as of midnight on December 31, 1989. The Repeal Act returned to the SNF coverage provisions that were in effect prior to the enactment of the Catastrophic Act. Under the Repeal Act, Medicare benefits for SNF services provided on and after January 1, 1990 are limited to 100 days and are available only where the beneficiary is transferred to an SNF within 30 days after being a patient in a hospital for no less than three consecutive days (the "post-hospital requirement").

Under the Repeal Act, Congress created certain transition rules to take care of individuals who were relying on benefits they received under the Catastrophic Act for their health care. With regard to extended care services coverage, the transition rule stated:

> [T]he limitation of coverage of extended care services to post-hospital extended care services shall not apply to an individual receiving such services from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990, until the end of the period of 30 consecutive days in which the individual is not provided inpatient hospital services or extended care services....

Pub.L. No. 101–234, § 101(b)(1)(C).

This case involves the interpretation given to this transition provision by the Secretary of the Department of Health and Human Services (the "Secretary") who, on his own, redefined the provision as follows:

> [A] beneficiary whose stay in a SNF ... continues from 1989 to 1990 is initially exempt from the post-hospital requirement that is reinstated in 1990.... *if all other requirements for Medicare payment for extended care services are met for a continuous period that includes at least 12/31/89 and 1/1/90.... If Medicare payment cannot be made for extended care services furnished on both December 31, 1989 and January 1, 1990, this transition exemption does not apply.*

Skilled Nursing Facility Manual (the "SNF Manual"), HCFA–Pub. 12, § IM 501 (Rev. IM–89–2, Jan. 1990) at 6 (emphasis added). *See also* Medicare Intermediary Manual ("Intermediary Manual"), HCFA–Pub. 13–3, § IM 3623 (Rev. IM–90–1, Feb. 1990); 55 Fed.Reg. 24159, 24160 (June 14, 1990).

Under the Secretary's construction of the Repeal Act, then, to obtain the additional 100 days of Medicare SNF coverage for services provided on or after January 1, 1990, a beneficiary must not only have received extended care services—services furnished by an SNF, *see* 42 U.S.C. § 1395x(h)—on both December 31, 1989 and January 1, 1990, but the beneficiary must also have received Medicare *payment* for those services on those days. This means that an SNF resident who, for example, had exhausted his or her 150 days of coverage on December 30, 1989, and therefore was not covered for the services received over the next 2 days, would not qualify under the transition provision for 100 additional days. The only way that this individual could obtain coverage for SNF services in 1990 would be to return to the hospital for a three-day stay and then be readmitted to an SNF. *See* Intermediary Manual, § IM 3623 (beneficiary who exhausted the SNF benefit period earlier in 1989, "does not qualify for exemption from the post-hospital requirement on January 1, 1990, because Medicare did not pay for December 31.")

Plaintiffs contest this construction of the transition provision on various substantive and procedural grounds. Primarily, plaintiffs contend that the express and unambiguous language of § 101(b)(1) provides that SNF residents who received "extended care services" continuously during a period including December 31, 1989 and January 1, 1990, are automatically entitled to a new benefit period of up to 100 days for 1990 without having to satisfy the post-hospital requirement. According to plaintiffs, the Repeal Act does not require that the care which the SNF resident received on December 31 and January 1 had been paid for by the resident's Medicare benefits. They

take the position that the statute simply requires that the resident received "such services" in order to qualify for 100 days of additional coverage for those services in 1990.

Plaintiffs contend that defendant's transitional policy unlawfully denies plaintiffs and others similarly situated SNF Medicare benefits to which they are entitled under the Repeal Act.

*The Repeal Act:*

■ Congress in § 101(b)(1)(C) of the Repeal Act extended transition benefits to "an individual receiving *such services* from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990." (Emphasis added). The controversy at issue here involves the definition of the term "such services." Plaintiffs contend that the words should be interpreted according to their plain meaning, that is, SNF extended care services, whereas defendant argues that the term covers only those SNF services which were actually covered by Medicare benefits on December 31, 1989, and January 1, 1990.

This Court holds that defendant's policy of limiting benefits under the Repeal Act only to residents who actually received Medicare payment for services received on December 31, 1989 and January 1, 1990, is at odds with the plain and unambiguous language of the statute and finds no support in its legislative history. The language of § 101(b)(1)(C) is capable of only one interpretation. The Repeal Act provides that in order to be eligible for 100 days of SNF transition coverage in 1990, an SNF resident must have done nothing more than receive extended care services from an SNF on December 31, 1989 and January 1, 1990. There is no requirement that the SNF services received actually have been paid for by Medicare.

Congress must be taken to have intended what it plainly expressed. This is a basic principle of statutory construction. The court's role is simply to enforce a statute according to its plain terms. *United*

States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). In this case, there is no support for the Secretary's expanded interpretation of the statute. Neither the Joint Explanatory Statement of the Conference Report nor the pre-conference bills contain any language suggesting that Congress desired to limit transition coverage to patients who were actually covered, i.e., actually reimbursed for SNF services, on the days in question.

In support of its position, defendant cites a number of statements made by individual Congressmen. These provide defendant with little if any comfort. In introducing the first version of his bill, Representative Donnelly stated:

[t]he bill repeals all benefits, generally, effective on January 1, 1990. However, to the extent that a beneficiary is receiving benefits under the bill on that date, the beneficiary is generally held harmless. Thus, if a beneficiary was hospitalized in 1989, the days of hospitalization in that year are not treated as a spell of illness. In addition, a beneficiary who is hospitalized on January 1, 1990 will not have to pay a second deductible during that spell of illness.

135 Cong. Rec. H5125. The reference in this statement is not to § 101(b)(1)(C) but rather to provisions regarding the determination of a "spell of illness" and the inpatient hospital deductible. Defendant's unexplained use of the statement is therefore incomprehensible. Actually, the plain meaning of the entire statement, to the effect that a patient who was hospitalized on January 1, 1990, would qualify for special consideration under the Repeal Act, undermines defendant's theory. The words "was hospitalized" are used, and there is no mention of a requirement that hospitalization must have been paid for by Medicare.[2]

---

**2.** Defendant argues that the second reference to "the bill" is the Catastrophic Act rather than the Repeal Act, and that therefore Representative

Donnelly's statement encompasses only patients "receiving benefits" on the given dates. However, the Catastrophic Act was already an Act at

Defendant also makes reference to a comment made by Senator Roth that the transitional rules "help accomplish repeal in a manner that is not disruptive to individuals currently receiving benefits." 135 Cong. Rec. S12882. This statement gives defendant little help. Plaintiffs have given a reasonable interpretation to this comment, namely, that the word "currently" should be read normally to mean during 1989, as Senator Roth made this statement on October 6, 1989. "Currently" certainly cannot be read to mean "on and before January 1, 1990." The logical interpretation is that eligibility for transition benefits requires that recipients must have been receiving Medicare benefits at some point during 1989. The plain reading of Senator Roth's statement is consistent with this, rather than with the more strained interpretation suggested by defendant.

Senator Coats' statement, although offered by defendant, seems to be more helpful to plaintiffs' position. Senator Coats, a co-sponsor of the Repeal Act, explained that its intent was "to insure that no Medicare beneficiary [would] be forced out of a hospital room or nursing home bed due to repeal." 135 Cong. Rec. S12887. This statement is entirely consistent with plaintiffs' interpretation of the Repeal Act, namely, that anyone who was in an SNF at the end of 1989 would receive 100 additional days in 1990, automatically, and would not "be forced out" of that facility.

■ Defendant next argues that this Court should look to the letter written by Representative Donnelly to HCFA on December 21, 1989, some 8 days after the Repeal Act was signed into law. In his letter, the Congressman stated that the "intent of this provision was to limit the benefit of the exemption to individuals for whom Medicare was making payment at the end of 1989," Letter of Representative Donnelly at 1 (Defendant's Motion to Dismiss, Exhibit G). This letter was in response to a telephone call from HCFA after the Secretary had determined that his

narrow interpretation of the statute, would save the Treasury some $460 million dollars. This Court does not find Congressman Donnelly's statement compelling because "statements by individual legislators should not be given controlling effect," especially where they are inconsistent with statutory language and other legislative history. *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 1840–41, 90 L.Ed.2d 248 (1986) (citations omitted). This letter was written after passage of the Repeal Act, and while it may reflect Representative Donnelly's later thoughts about the Act, it neither corresponds with anything discussed during the passage of the Act nor parallels any of the language actually used in the statute.

It is clear, based on the statutory language and the legislative history, that the Repeal Act was intended to extend 100 days of transitional extended care benefits in 1990 to patients who were in an SNF under the provisions of the Catastrophic Act, regardless of whether those patients actually received Medicare benefits on December 31, 1989 and January 1, 1990.

The Secretary's interpretation is not only inconsistent with the language of the statute but also suffers from being illogical. The Secretary admittedly would extend transition benefits to all SNF patients who were receiving benefits on January 1, 1990. However, without the transition period provisions, the Repeal Act would automatically end coverage at midnight on December 31, 1989, for every SNF patient who had not satisfied the post-hospital requirement prior to being admitted. While these patients might continue to receive services after this date, they would no longer be entitled to receive Medicare payment. The transition provisions were intended to remedy this situation. However, under the Secretary's position, namely, that only patients *covered* on *January 1, 1990* are entitled to transition benefits, not one person cut off by the Repeal Act would be helped. Rath-

---

the time of Representative Donnelly's statement, as it was already part of the Medicare statute, and thus, it would not have been referred to as a "bill." On the other hand, the Repeal Act was

only a bill at this time, and thus the statement must be understood to mean that under the Repeal Act, patients need not actually have been "covered" on January 1, 1990.

er, only those patients who were not affected by the Repeal Act because they had satisfied the post-hospital requirement, and who therefore *were* covered on January 1, 1990, would qualify for transition benefits. This is clearly not what Congress intended, and the Secretary's policy literally makes no sense.

■ Because the Secretary's interpretation of the Repeal Act's transition provisions is inconsistent with what this Court deems to be Congress' express statutory mandate, this Court need not defer to the agency. *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *N.L.R.B. Union v. FLRA*, 834 F.2d 191, 198 (D.C.Cir.1987); *Waterman S.S. Corp. v. Burnley*, 691 F.Supp. 1524, 1533 (D.D.C.1988). The statutory provision at issue in this case is unambiguous and allows for only one reasonable construction. Even if there were some ambiguity, a court need not defer to an agency's views on a "pure question of statutory interpretation." *Union of Concerned Scientists v. United States Nuclear Regulatory Commission*, 824 F.2d 108, 113 (D.C.Cir.1987).

■ Remedial statutes should be broadly construed so as to effectuate their remedial purposes and serve the interests of the individuals they were designed to protect. *Rodriguez v. Compass Shipping Co., Ltd.*, 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981); *Bell v. Brown*, 557 F.2d 849 (D.C.Cir.1977). The Medicare laws should be construed so as "not to disentitle old, chronically ill and basically helpless, bewildered, confused people." *Gartmann v. Department of Health and Human Services*, 633 F.Supp. 671, 679 (E.D.N.Y.1986). There is therefore no justification, given the clear language of the statute and the legislative history, to defer to the Secretary's overly restrictive interpretation of § 101(b)(1)(C). Accordingly, this Court finds as a matter of law that the Secretary's interpretation is invalid.

*Class Certification:*

■ Plaintiffs have moved for certification of a class consisting of all individuals who have been or will be denied Medicare SNF coverage pursuant to the Secretary's policy of requiring that patients who received extended care services on December 31, 1989, and January 1, 1990, must also have actually received Medicare coverage on those days in order to be eligible for 100 days of coverage in 1990 without having to satisfy the post-hospital requirement. This class consists of thousands of individuals all over the United States who were receiving extended care services on December 31, 1989, and January 1, 1990, but have been or will be denied coverage for skilled nursing facility benefits in 1990 under the Repeal Act due to the Secretary's flawed interpretation of that statute.

All of these individuals are commonly affected by the Secretary's interpretation of the Repeal Act. Whether the Secretary has correctly construed that Act so as to deny these individuals SNF benefits in 1990 is a question of law common to all these individuals.

The named plaintiffs in this action are elderly individuals who were receiving extended care services at an SNF for a continuous period including December 31, 1989, and January 1, 1990. They received 150 days of SNF benefits under the Catastrophic Act in 1989.[3] Plaintiffs have either had their claims for 1990 Repeal Act coverage denied by an insurance intermediary, have had their benefits for 1990 recouped, or have submitted initial determination/reconsideration requests. *See* Plaintiffs' Memorandum Regarding Status of Plaintiff's Claims.

Under plaintiffs' interpretation of the Repeal Act, they should automatically qualify for 100 days of SNF benefits in 1990. The Secretary, however, has denied plaintiffs that coverage unless the care they received on the days of December 31 and January 1 was actually covered by Medicare.

The plaintiffs have clearly satisfied the three requirements for class certification pursuant to Fed.R.Civ.P. 23(b)(2). First, the members of the class are so numerous that joinder would be impracticable. Sec-

---

**3.** Plaintiffs received these benefits without hav- ing to satisfy the post-hospital requirement.

ond, the questions of law and fact are common to all members of the class and the claims of the representative parties are typical of the entire class. All members of the class and all the named plaintiffs have the same interest—obtaining a reversal of the Secretary's policy in order to obtain 100 days of SNF benefits in 1990 under the Repeal Act. There is no requirement that a factual record be developed, as the issue raised is discrete and narrow and is thus particularly well-suited for determination as a class action. Moreover, the representative parties will fairly and adequately protect the interest of the class as a whole. The Center for Medicare Advocacy has wide experience in Medicare-related litigation and has demonstrated admirable commitment to furthering the interests of the elderly.

Defendant's objection to class certification centers on his view that each plaintiff requires an individualized administrative review before he or she can obtain a reversal of a denial of benefits. However, defendants miss the focus of plaintiffs' claims. Plaintiffs are attacking the legitimacy of the Secretary's interpretation of a Congressional enactment. Thus, plaintiffs satisfy the third requirement for class certification as well: the Secretary has acted on grounds generally applicable to the class, thereby making appropriate relief with respect to the class as a whole:

> Plaintiff[s] ... [do] not request an adjudication of individual class members' entitlement to benefits. Rather [they] seek[ ] only a determination of the validity of certain administrative regulations and policies which themselves determine eligibility when applied to specific cases.

*Pratt v. Heckler*, 629 F.Supp. 1496, 1503, *reconsideration denied sub nom. Pratt v. Bowen*, 642 F.Supp. 883, 885–87 (D.D.C. 1986).

■ Defendant argues that these individuals cannot comprise a class because their claims are premature and inchoate, as the class is not restricted to those individuals who have actually been denied benefits after presenting a claim. To begin with, this Court takes note of plaintiffs' argument that many putative class members were notified by their SNF that they were ineligible for transitional benefits without being informed of their right to appeal this decision or with instructions drafted by the Secretary which implied that review was available only of the beneficiary's claim, and not of the Secretary's interpretation of the Repeal Act. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss at 5–12. Therefore, a failure by a putative class member to present a claim after being informed by the SNF that benefits were not available given the Secretary's transition policy is attributable to misinformation on the part of the Secretary, rather than a desire to avoid the administrative process.

The class appropriately includes those individuals who have been denied or who *will* be denied benefits because of the Secretary's interpretation of the Repeal Act. Hence, all members of the class either have or will meet the jurisdictional "presentment" requirements *before* becoming a member of the class. This is not unlike the class certified by the district court in *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 2027 n. 6, 90 L.Ed.2d 462 (1986), where the class included all individuals whose "applications for benefits have been denied or *whose benefits have been or will be terminated on the basis of defendants' determination* that such people are capable of substantial gainful activity." (Emphasis added).

This case presents compelling reasons for class certification. The plaintiffs are elderly and sick Medicare patients. They are dependent on the receipt of Medicare benefits for their care; whether or not they receive 100 days of coverage in 1990 could influence their economic ability to arrange for future health care. Moreover, because of their age and infirmity, plaintiffs are particularly vulnerable to the time process and errors of the administrative process. One of the original named plaintiffs in this case has already passed away without having her Medicare benefits claim adjudicated.

For the foregoing reasons, this Court certifies a nationwide class consisting of all persons who have been or will be denied SNF Medicare benefits due to the Secretary's construction of § 101(b)(1)(C) of the Repeal Act.

*Exhaustion:*

■ Plaintiffs argue that this Court has jurisdiction pursuant to 42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1395ff. Section 405(g) provides:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party .... may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

Defendant's primary contention is that this Court lacks jurisdiction to hear plaintiffs' action because the plaintiffs have failed to exhaust their administrative remedies. According to defendants, "[t]his case involves a simple failure to exhaust administrative remedies." Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss at 1. Defendant argues that the Court cannot review the Secretary's instructions in the SNF manual. According to defendant, this Court can only review each individual plaintiff's eligibility if plaintiff has been denied benefits after compliance with the defendant's 4–step administrative review process.

The first step in this process consists of presenting a formal claim to a fiscal intermediary within one year of the date health care services are provided.[4] The fiscal intermediary, with whom the Secretary contracts, makes the initial determination of the claim's merit on behalf of the Secretary. If the claim is denied, the claimant has a right to reconsideration by the Health Care Financing Administration ("HCFA"), which reviews the intermediary's determination, the administrative record, and any additional information provided by the claimant. If the claim is still denied, the claimant has a right to an administrative appeal before an Administrative Law Judge ("ALJ").[5] If the ALJ denies the claim, review may be obtained from HHS' Appeals Council.

■ Defendant argues that the Secretary is not deemed to have rendered a "final decision" until all four steps in the administrative process have been completed. Defendant contends that the Supreme Court in *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), provided that a court may not review a claim arising under the Medicare Act unless all four steps in the administrative process have been pursued. However, *Ringer* does not stand for the proposition that a court may *never* intervene before the administrative process has been exhausted. The *Ringer* Court noted that while plaintiffs *must* meet the requirement of initially presenting a claim before federal court jurisdiction attaches, the requirement that the claimant fully pursue the prescribed administrative remedy is "waivable." *Ringer,* 104 S.Ct. at 2023.[6]

Among the elements to be considered by the court in its application of the exhaustion requirement is whether the plaintiffs' claim is wholly "collateral" to their claim for benefits and whether they have a colorable claim that an erroneous denial in the early stages of the administrative process would injure them in a manner which could not be remedied by later payment of benefits. *Id.* In addition, where further exhaustion would be futile, the Supreme Court noted that "deference to the Secretary's conclusion as to the utility of pursu-

---

**4.** The fiscal intermediary is usually an insurance company.

**5.** This applies to claims for $100 or more.

**6.** Moreover, defendant's reliance on *Ringer* is somewhat misplaced. In *Ringer,* the only effect of the Secretary's ruling on plaintiffs was to require them to pursue the administrative process. Plaintiffs in *Ringer* were assured benefits at the end of the administrative proceeding, which is not the case with the plaintiffs before this Court. Moreover, the Supreme Court noted that the determination of benefit eligibility was completely within the Secretary's discretion and competence, whereas the question of a provision's constitutionality is not. *Bowen,* 106 S.Ct. at 2023 n. 11.

ing the claim through administrative channels is not always appropriate." *Id.*

For example, the Supreme Court in *Bowen* held that the district court properly waived the exhaustion requirement to permit plaintiffs to challenge an internal policy of the Secretary that denied disability benefits to any claimant who did not meet the Secretary's list of specified impairments. Plaintiffs there argued that the presumption led to routine denials of eligible claimants, and the policy was therefore arbitrary and capricious in violation of the Social Security Act and applicable regulations.

The *Bowen* Court, in considering whether it was permissible to hear the claims of these plaintiffs notwithstanding the Secretary's exhaustion procedure, quoted the landmark case of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976): "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Bowen*, 106 S.Ct. at 2031.

Applying the *Ringer* analysis, the Supreme Court held that the plaintiffs in *Bowen* were entitled to immediate relief without exhausting their administrative remedies on the basis that, first, their claims were collateral to the claims for benefits because "[t]he class members neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." *Id.* at 2032. Second, the Court held that "the claimants ... would be irreparably injured were the exhaustion requirement ... enforced against them." *Id.* The Court considered the severe medical conditions of the plaintiffs and noted that a court "should be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive [what] they should have been afforded in the first place." *Id.*

In sum, the *Bowen* Court held that, notwithstanding its holding in *Ringer*, where a claimant alleges more than deviation from applicable regulations and instead asserts a "systemwide ... policy that [is] inconsistent in critically important ways with established regulations" and which does not depend on the particular facts of the claimant's case, the exhaustion requirement may be excused. *Bowen*, at 2032–33.

The case currently before this Court is squarely governed by the holding in *Bowen*. Plaintiffs in this case do not seek an award of benefits to individual claimants but rather a court determination that the Secretary's policy violates the Repeal Act. The interpretative issue raised by plaintiffs is clearly collateral to their individual claims for benefits.

Plaintiffs in this case are all sick and elderly persons. It would be unreasonable to force each of them to pursue an administrative process with respect to which they were absolutely assured a denial of their claim based upon an impermissible interpretation. Because the intermediary insurance companies work on contract with the Secretary, they are required to follow his interpretations. This means that each and every claim for 1990 SNF transition benefits presented to an intermediary by plaintiffs will be summarily denied. Moreover, these plaintiffs are often stymied even earlier in the process, because the SNF is put on notice that the intermediary will deny the claim and therefore will not file a claim on behalf of the patient until the patient submits a "demand bill," thereby lengthening the process further.

Defendant contends that because only the intermediary is governed by the Secretary's interpretations, there is no basis for an assertion that exhaustion would be futile as it is conceivable that a claimant would be granted benefits, notwithstanding the Secretary's policy, further along in the administrative process. However, it is clear that the plaintiffs will face certain denial at the administrative stage as well as at the intermediary stage, because HCFA follows the Secretary's interpretation. Indeed, it is HCFA that is responsible for crafting the interpretation in the first place.

Whether or not ALJ's and the Appeals Council have certain independence in ren-

dering decisions, they must give great deference to the Secretary's interpretation as it constitutes the applicable law to be enforced. Even in the unlikely event of a reversal by an ALJ or the Appeals Council, there would be no procedential effect outside of the specific claimant's case, and intermediaries would still be bound to treat all other claimants according to the Secretary's existing policy. To force elderly and sick patients to proceed through an elaborate administrative process where an improper interpretation is being applied to deny them their benefits is an indignity that no individual should suffer. This is certainly not what is intended by the policy underlying the exhaustion requirement.

It is simply not meaningful to point to the chance that the plaintiffs might obtain a reversal later in the administrative process. Denial of benefits to these elderly plaintiffs will almost certainly cause irreparable harm which cannot be remedied by a later reversal. These plaintiffs are struggling to obtain the funds necessary to arrange for their SNF care. Denial of Medicare benefits can result in indigence, loss of crucial health care, and emotional distress. Moreover, the legal costs involved for each of the plaintiffs to exhaust their administrative remedies and then to pursue individually court contests could be astronomical.[7] As the court in *Fox v. Bowen*, 656 F.Supp 1236, 1240–1241 (D.Conn.1986) explained concerning coverage denials to SNF patients in their mid–80's needing daily skilled physical therapy treatments:

> Patients who are denied Medicare coverage are responsible for paying for their own physical therapy through insurance, personal savings or contributions from family members.... In such circumstances, many patients forgo medically necessary physical therapy because they or their families believe that they cannot afford to pay for such therapy themselves....

> A patient's recovery may be jeopardized.... In some cases, ... recovery is also inhibited by the emotional distress that may result from a denial of Medicare coverage.

The record before this Court dramatically illustrates these cogent points. Plaintiff Mary Kirwin was moved from a Medicare-certified to a non-certified bed in the nursing home when SNF benefits were denied.[8] Elouise Munoz, another member of the plaintiff class, was denied SNF benefits under the Secretary's interpretation. Because of this, her right to supplemental insurance was not triggered, and her 1990 bill remained unpaid. The SNF would not readmit her, and she was forced to transfer to a different nursing home, in a county far from the home of her son who was looking after her.[9]

The administrative process is rife with delays. According to information compiled from the Social Security Administration Office of Hearings and Appeals and the Center for Medicare Advocacy, the four-step administrative process would involve an average total of 632 days. *Id.* at 3. While the delay involved in the administrative process is not enough to excuse exhausting that process, in the case of the ill and elderly, mechanical application of that process causes intolerable hardship. Any relief afforded by this Court would not be "[in]consistent with the policies underlying exhaustion" because by simply ordering that "the claims be reopened at the administrative level, this District Court [would show] proper respect for the administrative process.... [doing] no more than the agency would have been called upon to do had it, instead of the District Court, been alerted to the charge than an undisclosed procedure was illegal and had improperly resolved innumerable claims." *Bowen*, 106 S.Ct. at 2033.

Plaintiffs are not using this lawsuit to bypass the administrative process but rath-

---

7. Furthermore, if plaintiffs ultimately prevailed, these legal costs would most likely be borne by the government.

8. Plaintiff's Memorandum Regarding Status of Plaintiffs' Claims at 5.

9. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss at 16.

er to make that process meaningful. What plaintiffs seek in this action is collateral to their claims for benefits, and requiring exhaustion of the administrative process would be futile and would lead to irreparable harm. Accordingly, this Court finds that the class members have standing to bring this suit and that it has jurisdiction to adjudicate their claims.

*Conclusion:*

Defendant's motion to dismiss will be denied because this Court finds that it has jurisdiction to adjudicate plaintiffs' claims. Furthermore, because this case presents compelling reasons for class certification, this Court will grant plaintiffs' motion to certify a nationwide class. Lastly, this Court will grant summary judgment for plaintiff class. The issue before this Court is solely a question of law involving statutory construction; there is no need for further discovery or the establishment of a factual record, as explained above in the certification of the class of plaintiffs. Accordingly, this Court finds that the plaintiffs, as a class, are entitled to summary judgment as a matter of law.