Mary TATARANOWICZ,
et al., Appellees,

v.

Louis W. SULLIVAN, M.D., in his Official Capacity as Secretary, Department of Health and Human Services, Appellant.

No. 91–5052.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1991.

Decided March 13, 1992.

Rehearing and Rehearing En Banc
Denied June 1, 1992.

Howard S. Scher, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Barbara Biddle, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellant.

Thomas C. Fox, Washington, D.C., for appellees.

Before: BUCKLEY and WILLIAMS, Circuit Judges, and ALAN D. LOURIE,[*] Circuit Judge, U.S. Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Circuit Judge BUCKLEY.

STEPHEN F. WILLIAMS, Circuit Judge:

In the Medicare Catastrophic Coverage Act of 1988 ("Catastrophic Coverage Act"), Pub.L. No. 100–360, 102 Stat. 683 (1988), Congress expanded Medicare coverage for services in qualified skilled nursing facilities ("SNFs"). The next year, reacting to protest by those on whom it had laid the expense, Congress reversed itself, enacting the Medicare Catastrophic Coverage Repeal Act of 1989 (the "Repeal Act" or "Act"), Pub.L. No. 101–234. The Repeal Act took effect December 31, 1989, largely restoring the *status quo ante*, but including a "transition provision" affording some continued protection to beneficiaries of the Catastrophic Coverage Act. See *id.* at 101(b)(1), 42 U.S.C.A. § 1395e note (West Supp.1991). At issue here is how much. We find the transition provision ambiguous and the Secretary's construction of it reasonable. Accordingly, we reverse the district court's decision rejecting the Secretary's interpretation.

## I.

Before the Catastrophic Coverage Act, eligible Medicare recipients were entitled to coverage of the costs of SNF services, subject to two restrictions. First, the coverage extended for only 100 days per "spell of illness"[1]; second, the SNF services were covered only if they followed a hospi-

---

[*] Sitting by designation pursuant to Title 28 U.S.C. § 291(a).

1. "Spell of illness" was defined as the period beginning the day on which coverage began and ending "with the close of the first period of 60 consecutive days" during which the patient is no longer "an inpatient of a skilled nursing facili-

ty." 42 U.S.C.A. § 1395x (West 1983). Thus, an individual who exhausted his or her 100 days of coverage could not leave an SNF for less than 60 days only to return again to begin a "new" spell of illness. But if a patient returned to a SNF after 60 days, he or she could resume coverage on a new 100 days.

tal stay of at least three days. (Congress appears to have provided assistance for SNF costs on the theory that doing so would keep overall costs down by inducing patients to transfer from hospitals to less costly SNFs; it imposed the post-hospital stay requirement to limit the assistance to transfer cases. See S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S.C.C.A.N. 1943, 1971, 1987.) The Catastrophic Coverage Act removed the spell of illness limitation, substituting a simple limit of 150 days of SNF coverage per calendar year;[2] it completely deleted the post-hospital stay requirement. 42 U.S.C. § 1395d (1988). The Repeal Act returned to the prior regime by reinstating both limitations. 42 U.S.C.A. § 1395d(a) (West 1983 & 1991 Supp.).

To soften the blow, Congress included the following transition provision:

**(b) Transition provisions for Medicare beneficiaries.**

**—(1) Inpatient hospital services and post-hospital extended care services.—** In applying [42 U.S.C. §§ 1395d and 1395e], as restored by subsection (a)(1) [of the Repeal Act], with respect to inpatient hospital services and extended care services provided on or after January 1, 1990—

(A) no day before January 1, 1990, shall be counted in determining the beginning (or period) of a spell of illness;

. . . . .

(C) the limitation of coverage of extended care services to post-hospital extended care services shall not apply to an individual receiving such services from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990, until the end of the period of 30 consecutive days in which the individual is not provided inpatient hospital services or extended care services. . . .

Pub.L. No. 101–234, § 101(b)(1), 42 U.S.C. § 1395e note.

All hands appear to agree on how this affects the reinstituted spell-of-illness requirement. Everyone gets a fresh start in 1990, with 1989 bygones treated as completely bygone. Thus, a patient who was in a SNF at the end of 1989 and who satisfied the post-hospital stay requirement would start a spell of illness on January 1, 1990. This would be true regardless of whether the patient had exhausted the Catastrophic Coverage Act's 150–day allowable. Presumably the logic of this is that patients would have rested any decisions on the use of SNF services on the Catastrophic Coverage Act's 150–day rule being the sole limit and so should not be penalized in the next year for their use of that allowance.[3] Nor would it have made sense to require that the patient have been in a SNF on December 31, 1989; the purpose of subsection (A) is not to *continue* some kind of coverage but to relieve patients from adverse effects that events under the 1989 regime might otherwise have had on their allowables under the Repeal Act.

The parties diverge as to the post-hospital stay requirement. Plaintiffs, who have been or will be denied benefits under the Secretary's interpretation of § 101(b)(1)(C), read it as exempting all individuals who *received* SNF services on December 31, 1989 and January 1, 1990, regardless of whether the services on December 31, 1989 were covered by Medicare. The Secretary reads it as exempting from the post-hospital stay requirement only those patients whose stay on December 31 was *covered by Medicare.*

These positions are most meaningful if we look at some specific examples:

(A) A patient is in a SNF on December 31, 1989 and January 1, 1990, having exhausted only 120 days of those allowable under the Catastrophic Coverage

---

**2.** Because the Catastrophic Care Act expanded coverage to 150 days *per calendar year* instead of 100 days *per spell of illness,* exactly what constituted a "spell of illness" became irrelevant. Patients might move in and out of SNFs repeatedly during a calendar year; regardless of

the size of the interludes, their first 150 days were covered, and days after 150 were not.

**3.** At least they would have done so until repeal, which occurred December 13, 1989.

Act and having never had a hospital stay. The patient was eligible for coverage on December 31. Under the Secretary's view, the patient needs exemption from the post-hospital requirement and receives it because of his covered SNF stay on December 31. See Medicare Intermediary Claims Manual, Part 3—Claims Process, Transmittal IM–90–1 ("Claims Manual"), Joint Appendix ("J.A.") 90, 94 (Example 1). Plaintiffs of course agree that this patient can start a covered spell of illness; he needs the exemption from the post-hospital requirement and receives it because of his presence in a SNF on December 31.

(B) A patient is in a SNF on December 31, 1989. He has previously exhausted the 150 days allowable in 1989 under the Catastrophic Coverage Act. He has, however, satisfied the post-hospital stay requirement. On both parties' views he will be covered (indeed, starts a spell of illness) on January 1, 1990. Under the Secretary's view, the key is that he has *satisfied* the post-hospital requirement. See Claims Manual, J.A. at 95 (Example 4). Under the plaintiffs', his presence in the SNF on December 31 assured coverage under the transition provision, regardless of his having also satisfied the post-hospital requirement.

(C) A patient has exhausted the Catastrophic Coverage Act's 150 days well before December 31, 1989 but remains in a SNF till the year's end and into 1990. He has never satisfied the post-hospital requirement. On plaintiffs' view, he is eligible to start coverage under a new spell of illness. As he was in the SNF on December 31, 1989 and continued there, he is exempt from the post-hospital requirement. On the Secretary's view, he is ineligible for coverage starting January 1, 1990. He has not satisfied the post-hospital requirement; since his stay on December 31, 1989 was not covered, he is not entitled to the exemption. See Claims Manual, J.A. at 94–95 (Example 2).

Mary Tataranowicz and thirteen other named plaintiffs brought a class action on behalf of themselves and all others who had been or would be denied benefits due to the Secretary's interpretation of the SNF transition provisions. The district court certified a class so defined and then held that the grandfather clause clearly and unambiguously exempted from the post-hospital requirement all who were SNF patients on December 31, 1989 and who continued in the SNF. Thus it found the Secretary's construction entitled to no deference. Accordingly, the court ordered the Secretary to exempt otherwise eligible SNF patients from the reinstated post-hospital requirement whether or not they had exhausted their 150 days of Medicare coverage for 1989.

The Secretary brings two challenges on appeal. First, he argues that no members of the certified class have satisfied the essential procedural prerequisites to suit—"presentment" and exhaustion. Second, he argues that the transition provision was ambiguous and his own construction reasonable. We find that some though not all of the plaintiff class have satisfied or been excused the requirements of presentment and exhaustion, but reverse on the merits.

## II.

First we reject the Secretary's suggestion that we may leap over the jurisdictional or quasi-jurisdictional issues on the grounds that it is proper to do so when those issues are difficult, and the party raising them wins easily on the merits. See *Norton v. Mathews*, 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976); *Cross–Sound Ferry Services, Inc. v. Interstate Commerce Commission*, 934 F.2d 327, 332–34 (D.C.Cir.1991). We need not consider whether the jurisdictional issues here are difficult enough, and the merits issues easy enough, to qualify under that doctrine. The Secretary calls our attention to no case in which the doctrine was invoked to excuse the court's identifying the parties to the suit. But compare *Mathews v. Diaz*, 426 U.S. 67, 71–72 n. 3, 96 S.Ct. 1883, 1887–1888 n. 3, 48 L.Ed.2d 478 (1976) (in making final decision against constitutional attack on statute, the *Supreme Court*, whose decision will control all others, finds it unnec-

essary to find exact class boundaries). Here identifying the parties requires us to define the plaintiff class, which turns on the presentment and exhaustion issues. Without this determination, the collateral effect of the judgment would be completely obscure.

█ The Medicare Act, 42 U.S.C. § 1395 *et seq.*, provides for judicial review "after such hearing as is provided in section 405(g) of this title", 42 U.S.C. § 1395ff, and the Supreme Court has read § 405(g) as imposing two prerequisites to judicial review. The first is that the plaintiff present a claim for the benefits to the Secretary (who, the parties agree, is here represented by the fiscal intermediaries who make initial payment determinations on his behalf). The second is that the plaintiff exhaust all administrative remedies available after an initial denial. The Court has said that the presentment requirement is not "waivable" but that the exhaustion requirement is. *Mathews v. Eldridge*, 424 U.S. 319, 328–30, 96 S.Ct. 893, 899–900, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 763–65, 95 S.Ct. 2457, 2465–67, 45 L.Ed.2d 522 (1975). The Secretary argues that none of the members of the certified class has satisfied both requirements (or, in the case of exhaustion, qualified for "waiver").

### A.

█ As to presentment, the members of the certified class fall into three groups: (1) all plaintiffs, named and unnamed, who have already presented claims for and have been denied SNF coverage because of the Secretary's reading of § 101(b)(1)(C) ("claimants"); (2) all unnamed plaintiffs who have not yet presented a claim for coverage but will do so in the future and "will be denied" coverage—or would be denied, but for the litigation—("future claimants"); and finally, (3) all unnamed plaintiffs who have not presented a claim for coverage and will never do so, but who nevertheless would be denied coverage because of the Secretary's view ("nonclaimants"). Of these three, plaintiffs in the first group (including all the named plaintiffs) have clearly met the nonwaivable

presentment requirement, and are entitled to judicial review unless defeated by their failure to exhaust.

As to future claimants, the Supreme Court has sent mixed signals. In *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), it noted that the district court had erroneously certified a class including individuals who "will be denied" the benefits sought. The Court explained that "[t]hose who 'will be denied' enrollment ... are those who have yet to be denied...." As the record did not show "any action with respect to such persons that is tantamount to a denial", the district court lacked jurisdiction over their claims. *Id.* at 71–72 & n. 3, 96 S.Ct. at 1887–1888 & n. 3.

But in *Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the Court appeared to approve a class partially composed of future presenters (in the specific context, future filers of requests for reconsideration or waiver). The district courts had certified classes that included persons who had neither presented their claims in the past *nor* would do so in the future. *Id.* at 704, 99 S.Ct. at 2559. The Court characterized this class certification as "plainly too broad", *id.*, as it included individuals who *never would* present a claim (nonclaimants, in the terms of this case). But the court of appeals had framed its holding as entitling claimants to a hearing " 'when they claim a waiver [i.e., present their claims].' " As claimants could enjoy the remedy only by "filing a written request with the Secretary," the Court said that only persons meeting the jurisdictional prerequisites would get relief. *Id.* Thus, without mentioning *Diaz*, the Court appeared to approve a class including persons who had not yet satisfied § 405(g) but would ultimately do so. See also *Dixon v. Heckler*, 589 F.Supp. 1494, 1512 (S.D.N.Y.1984), *aff'd* 785 F.2d 1102 (2d Cir.1986), *vacated on other grounds sub nom. Bowen v. Dixon*, 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987); *Stieberger v. Heckler*, 615 F.Supp. 1315, 1329 (S.D.N.Y.1985). As the court pointed out in *Dixon*, this result is consistent with the

practice of defining classes to include persons who will in the future fit the class criteria. See *Dixon*, 589 F.Supp. at 1512 (citing *Brown v. Board of Education*, 84 F.R.D. 383, 394 (D.Kan.1979) (treating class of applicants to elementary school as extant 28 years after suit began, as class at outset included future members)). We need not address the issue of a class consisting only of persons who will in the future satisfy § 405(g)'s presentment requirement.

This leaves the third group of potential plaintiffs—nonclaimants. The appellees argue that the presentment requirement should be generically deemed satisfied because (1) some potential claimants received no notice of any right to claim benefits despite their want of a three-day hospital stay, and (2) others received a notice that appellees argue contained "crucial misinformation". Appellees' Brief at 17. Specifically, the appellees argue that the Model Letter sent out by the Secretary for distribution by SNFs to their patients misled them as to the source of their benefit denial. The Model Letter said:

> On (*date*), we reviewed your records in light of the recent Medicare SNF benefit changes, and we decided that (*you or beneficiary's name*) did not meet the reinstated post-hospital requirement for SNF coverage under Medicare, and did not qualify for an exemption from this requirement. Therefore, as of January 1, 1990, Medicare cannot cover your SNF care.
>
> This decision has not been made by Medicare. This decision is our judgment that you did not meet the Medicare post-hospital requirement. Normally in this situation, we do not submit a bill to Medicare. We will submit a bill to Medicare only if you request it. Furthermore, if you want to appeal this decision, you must request that a bill be submitted. If you request that a bill be submitted, the Medicare intermediary will review your records and notify you of its determination. If you disagree with that determination, you may file an appeal.

J.A. at 105–06.

The Supreme Court's repeated characterizations of presentment as not "waivable" suggest that no such exception for inadequate notice exists, as does the *Yamasaki* opinion's cursory rejection, as "plainly too broad", of a class containing persons who would not present their claims in the future. See *Yamasaki*, 442 U.S. at 704, 99 S.Ct. at 2559. But we need not here explore the existence or scope of any such exception. First, the sole claimant identified as receiving *no* notice has in fact presented her claim. See Appellees' Brief at 13 (all named plaintiffs presented their claims); J.A. at 62–69 (papers relating to plaintiff Corinne Dickinson). Without more evidence of want of notice, we see no need to address this speculative issue. Second, while the Model Letter does not give a complete picture of the reasons for denial and the avenues of redress, we doubt if any letter that would be meaningful for most Medicare applicants could possibly do so. The Model Letter makes clear (1) that there is a post-hospital stay requirement imposed from on high; (2) that the SNF believes the patient has not met the requirement; and (3) that the patient may press the claim with the fiscal intermediary. Any patient who doubted the validity of the post-hospital stay requirement would presumably think that the solution was first to ask the fiscal intermediary for relief, as in fact it was. We see no basis for holding, as appellees implicitly ask, that presentment is excused unless the notice explicitly enumerates all the arguable interpretive premises of the finding of unavailability and tells patients that each of these may be challenged before the fiscal intermediary.

## B.

As plaintiffs make no claim that any of their number exhausted their remedies from denial by the fiscal intermediaries, they can secure judicial review only if the exhaustion requirement is excused. In the Supreme Court's first treatment of this subject, *Weinberger v. Salfi*, 422 U.S. 749, 767, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975), the agency had raised no exhaustion defense, and the Court's characterization of

the result as a "waiver" was a conventional use of the term. Since then, the Court has extended the term to situations where the Secretary staunchly demands that the claim be dismissed for want of exhaustion, but the Court itself has excused non-compliance. The main cases are *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976); *Mathews v. Diaz*, 426 U.S. 67, 76–77, 96 S.Ct. 1883, 1889–1890, 48 L.Ed.2d 478 (1976); and *Bowen v. City of New York*, 476 U.S. 467, 483, 106 S.Ct. 2022, 2031, 90 L.Ed.2d 462 (1986).

The cases proceed against the backdrop of *Salfi*'s observation that § 405(g)'s requirement of a "final decision" was "more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility...." 422 U.S. at 766, 95 S.Ct. at 2467. As a result, two of the three major cases excusing exhaustion post-*Salfi* (*Eldridge* and *City of New York*) have rested on futility *plus* some version of the "collateral order" exception to finality established for federal appellate review by *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). See *Eldridge*, 424 U.S. at 331 n. 11, 96 S.Ct. at 901 n. 11 (citing *Cohen* ). *Diaz*, however, is a pure futility case, and we believe it applicable here.

Although the Secretary invoked want of exhaustion in *Diaz*, he stipulated that no facts were in dispute, that the case was ripe for disposition by summary judgment, and that the only issue was the constitutionality of the statute—an attack on a durational residence requirement. 426 U.S. at 76, 96 S.Ct. at 1889. The Secretary had stated twice in Supreme Court filings that the applicant's request for benefits would be denied on the basis of the requirement. *Id.* The Court characterized the stipulation in the district court "as tantamount to a decision denying the application and as a waiver of the exhaustion requirements." *Id.* at 77, 96 S.Ct. at 1890.

Here, the plaintiffs ask for a declaration that the Secretary's reading of § 101(b)(1)(C) was invalid and an injunction

against his denying Medicare reimbursement for SNF patients who would be eligible once the allegedly erroneous interpretation is swept away. It is hard to see how any factual disputes might stand in the way of that relief, and the Secretary suggests none. And, although the legal issue is statutory rather than constitutional, so that the Secretary has *authority* to decide the legal issue in plaintiffs' favor, compare *Diaz*, 426 U.S. at 76, 96 S.Ct. at 1889 (noting that the constitutional claim was beyond the Secretary's competence), the Secretary gives no reason to believe that the agency machinery might accede to plaintiffs' claims. He does not argue that ALJs are free to disregard his ruling, and he acknowledged at oral argument that review by the Appeals Council, apparently the next and final level of appeal, was in essence review by the Secretary himself. On this record, it seems wholly formalistic not to regard further appeals as completely futile.

Rather than offering any reason to doubt futility, the Secretary cites *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), where the Court refused to excuse want of exhaustion even though plaintiffs purported to attack the Secretary's systemwide interpretation of the statute as not authorizing reimbursement for a specific medical procedure. But there was ample reason for the Court's refusal to find futility in *Ringer*. Three of the four plaintiffs were not covered by the systemwide decision, as they had had the procedure before its effective date. As to them, there was no reason to suppose that the Secretary's policy declaration would bar recovery, and thus none to suppose that exhaustion was futile. 466 U.S. at 618–19 & n. 12, 104 S.Ct. at 2023–24 & n. 12. The fourth plaintiff had not yet had the operation. Section 405(g) blocked his claim, the Court found, because the statute plainly barred pre-operation advisory opinions even by the Secretary, and the Court declined to "undercut that choice by allowing federal judges to issue such advisory opinions." *Id.* at 621–22, 104 S.Ct. at 2025.

■ Our finding of futility is by its nature a finding that dispensing with further administrative process is consistent with the purposes of exhaustion. In *Salfi* the Court set these forth as follows:

Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765, 95 S.Ct. at 2467. Here, judicial resolution of the statutory issue (1) will not interfere with the agency's efficient functioning; (2) will not thwart any effort at self-correction; (3) will not deny the court or parties the benefit of the agency's experience or expertise; and (4) will not curtail development of a record useful for judicial review.

Because we believe our finding of futility to be nearly as firmly grounded as that of *Diaz*, we follow *Diaz* in not addressing the collateral order exception. We note that the doctrine at its outset appeared to be quite narrow, like that of *Cohen v. Beneficial Loan Corp.* itself. In *Eldridge* the Court emphasized that the particular claim raised—entitlement to a predeprivation hearing as a matter of right—"rest[ed] on the proposition that full relief cannot be obtained at a postdeprivation hearing." 424 U.S. at 331, 96 S.Ct. at 900. In *City of New York*, however, the Court appeared to loosen the doctrine, reasoning that insistence on exhaustion would impose irreparable injury because the ordeal of going through the administrative process might "trigger a severe medical setback", and that indeed persons had been hospitalized because of the trauma of having disability payments cut off. 476 U.S. at 483, 106 S.Ct. at 2031. Such hazards seem generic to Medicare claims, and indeed similar ones are urged here. As the findings of futility in both *Eldridge* and *City of New York* were relatively weak compared to those of *Diaz*, see *Eldridge*, 424 U.S. at 330, 96 S.Ct. at 900; *City of New York*, 476 U.S. at 485, 106 S.Ct. at 2032, we infer that collateral order arguments may serve to help excuse exhaustion where futility alone is not enough. Because of the similarity of our case to *Diaz*, however, we do not try to determine the exact relationship.

### III.

■ At last we reach the merits. Here, as usual, we look to *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and inquire whether Congress "has directly spoken to the precise question at issue", *id.* at 842, 104 S.Ct. at 2781. If so, "that is the end of the matter." *Id.* If not, we inquire whether the agency in charge of administering the statute has given it a "permissible construction", *id.* at 843, 104 S.Ct. at 2782, for we may not substitute our view "for a reasonable interpretation" made by the agency, *id.* at 844, 104 S.Ct. at 2782.

For convenience, we repeat the relevant text:

**(b) Transition provisions for Medicare beneficiaries.—(1) Inpatient hospital services and post-hospital extended care services.**—In applying [42 U.S.C. §§ 1395d and 1395e], as restored by subsection (a)(1) [of the Repeal Act], with respect to inpatient hospital services and extended care services provided on or after January 1, 1990—

(A) no day before January 1, 1990, shall be counted in determining the beginning (or period) of a spell of illness;

. . . . .

(C) the limitation of coverage of extended care services to post-hospital extended care services shall not apply to an individual receiving such services from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990, until the end of the period of 30 consecutive days in which the individual is not provided inpatient hospital services or extended care services . . . .

Pub.L. No. 101–234, § 101(b)(1), 42 U.S.C. § 1395e note.

At first blush, the language of § 101(b)(1)(C) seems to support the plaintiffs' interpretation. It exempts from the post-hospital stay requirement any "individual receiving such ["extended care"] services from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990 . . ."; it does not expressly mention entitlement to a Medicare subsidy on December 31, 1989 as a further qualification for exemption. Read without inquiry into context, the provision appears unambiguous.

The Secretary identifies an ambiguity in § 101(b)(1)(C) itself. "[S]uch services" could refer either to "post-hospital extended care services", which is the immediate prior reference to services, or to SNF services regardless of prior hospital stays. But as the Secretary himself goes on to note, that ambiguity is easily resolved; a person receiving extended care services that are "post-hospital" has no need of any transition provision on that issue, so the more general usage must be intended. The force of the ambiguity, once resolved, is largely spent. Contrary to the government's implicit suggestion, the presence of a single, readily cured ambiguity in a clause does not render it ambiguous on every other interpretive issue. The asserted ambiguity shows only that Congress did not draft the clause with mathematical precision.

Thus plaintiffs regard § 101(b)(1)(C) as so clear that we need inquire no further. They quote, for example, Justice Scalia's emphatic statement in *West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991):

> The best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators

or committees during the course of the enactment process.

*Id.* 111 S.Ct. at 1147. For other recent cases of similar tenor, see *Demarest v. Manspeaker,* —— U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

■ But while the immediate statutory text is the "best evidence" of congressional intent, the Court has never held that it is the *only* such evidence. To the contrary, it has repeatedly said that congressional intent can be understood only in light of the context in which Congress enacted a statute and of the policies underlying its enactment. See, e.g., *McCarthy v. Bronson,* —— U.S. ——, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) (Court relies on context to reject "the most natural reading" of a statutory phrase); *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 530, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983) ("A proper interpretation of the section cannot . . . ignore the larger context in which the entire statute was debated.").

Moving beyond § 101(b)(1)(C) itself, we find the caption of § 101(b), "Transition provisions for Medicare beneficiaries", making clear that transition benefits are to be available for beneficiaries. Under the plaintiffs' reading, subsection (C) creates an entitlement on the basis of mere *recipient* status on the controlling date (December 31, 1989). This creates at least some tension with the caption, even though, of course, the relevant non-beneficiary recipients as of that date would *have been* beneficiaries earlier in the year. At any rate, the reference to "beneficiaries" in the caption provides some support for the Secretary's view that in referring to recipients Congress likely *assumed* beneficiary status at the critical moment.

Moreover, the disputed phrase appears as part of a subsection, § 101(b), that is self-evidently devoted to special problems of transition back to the *status quo ante* the Catastrophic Coverage Act. Such grandfathering typically seeks to provide special relief for persons on whom the new regime might bear with unusual severity, because it specially disrupts their lives, usually because of decisions they are likely to have taken in reliance on the prior regime. See, e.g., *Sercl v. United States*, 684 F.2d 597, 599 (8th Cir.1982) ("Although the revenue ruling does not explicitly specify the purpose of the grandfather clause, the most logical explanation for it is to protect taxpayers who acted in reliance on the prior, revoked ruling."); cf. *Heckler v. Mathews*, 465 U.S. 728, 743–46, 104 S.Ct. 1387, 1397–99, 79 L.Ed.2d 646 (1984) (noting that purpose of limited exemption was to protect expectations developed before the Court's decision in *Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), subject to constraint of preventing major drain on Social Security trust funds).

We have already noted how subsection (A) serves typical grandfathering purposes, excluding any SNF days in 1989 from the computation of a "spell of illness" and thereby protecting patients who may have continued in a SNF longer than otherwise in partial reliance on the Catastrophic Coverage Act's allowance of 150 days.[4] It puts all who used Catastrophic Coverage Act benefits on a par with patients getting sick January 1, 1990, in the sense that a patient's enjoyment of past entitlements will not count against him.

While subsection (A) relieves a patient of possible *adverse consequences of having used benefits* under the Catastrophic Coverage Act, § 101(b)(1)(C)—under both competing constructions—goes further. It affirmatively entitles a class of Catastrophic Coverage Act beneficiaries to post–1989

coverage despite failure to satisfy the resurrected pre-1989 criterion of a prior hospital stay. In the Secretary's view, it affords this advantage only to patients actually enjoying Medicare-subsidized service at the moment of transition, whereas under plaintiffs' it protects patients in a SNF on December 31, 1989, even though their coverage has already run out.

Plaintiffs' reading seems broad in relation to conventional grandfathering goals. For the extra patients covered by plaintiffs' interpretation (but not by the Secretary's), presence in the SNF at year end seems hard to attribute to the fact of the Catastrophic Coverage Act's having more expansive terms than the earlier regime; they were there *in spite of* coverages having run out *even* under the Catastrophic Coverage Act regime. Conceivably some may have remained in the SNF longer than they otherwise would have, in anticipation of the resumption of coverage. But as their presence in the SNF after the allowed 150 days must have had non-Medicare sources of financing, any such reliance would have been highly attenuated.

Transition provisions could, of course, be yet more protective than even plaintiffs argue. Congress could have provided that anyone who received any Catastrophic Coverage Act benefits in 1989 would continue to be eligible under that regime. But as such protection would be far broader than any coverage based on reliance, dependency or disruption, it would seem prima facie unlikely. Plaintiffs' reading of § 101(b)(1)(C) encounters a similar problem.

Even if these contextual concerns left the language of § 101(b)(1)(C) superficially clear, legislative history may call such apparent clarity into question. In *Associated General Contractors*, for example, the Court said that while a "literal reading" of a statute giving standing to any person "injured" by an antitrust violation was "broad enough to encompass every harm" due to such a violation, it was necessary

---

**4.** Subsection (A) protects not only patients who used their 150 days under the Catastrophic Coverage Act but also those who stayed longer, without government support. This might suggest congressional readiness to protect a very weak form of reliance, namely continued use of *un*subsidized SNF services in anticipation of a

fresh start, per the Catastrophic Coverage Act, on January 1, 1990. But any patient in this position who benefits from subsection (A) will already have engaged in the strong form of reliance on the Catastrophic Coverage Act—use of the actual subsidy for 50 days longer than under the prior regime.

first to consider "whether Congress intended such an open-ended meaning." *Id.* at 529–30, 103 S.Ct. at 904. Consulting the legislative history, it found standing to be far more limited than the literal wording of the statute alone would have suggested. *Id.* at 530, 103 S.Ct. at 904. Similarly, in *United States v. Shirey*, 359 U.S. 255, 256–60, 79 S.Ct. 746, 746–49, 3 L.Ed.2d 789 (1959), the Court considered the legislative history of a statute prohibiting the purchase and sale of public offices and concluded that the Republican Party was a "person" for the purposes of the statute's application, *id.* at 257 n. 2, 79 S.Ct. at 747 n. 2, though the statutory language alone would not have suggested such a meaning. See also *Inner City Broadcasting Corp. v. Sanders*, 733 F.2d 154, 158 (D.C.Cir.1984) ("*[U]nless contrary indications are present*, a court can assume that Congress intended the common usage of the term to apply.") (emphasis added); *Alabama Power Co. v. Costle*, 636 F.2d 323, 396 (D.C.Cir. 1979) ("*Given no expression of any contrary intent in the Act or in the legislative history regarding [its meaning]*, we must assume that the meaning of a particular term is to be consistent throughout the Act.") (emphasis added).

The legislative history of the transition provision reveals a purpose consistent with conventional grandfathering goals. There being no pertinent references in the committee reports, we turn to statements by both the House and the Senate sponsors of the bill, normally the next-highest ranked

form of legislative history. *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66–67, 84 S.Ct. 1063, 1068–1069, 12 L.Ed.2d 129 (1964); *Lewis v. Sporck*, 612 F.Supp. 1316, 1330 (N.D.Cal.1985). All of these indicate an intent to use § 101(b)(1)(C) to exempt from the post-hospital requirement individuals who were, as of December 31, 1989, receiving SNF *coverage*. Representative Donnelly, in a rather formal statement captioned "Technical Description of the Catastrophic Coverage Repeal Act of 1989", 135 Cong. Rec. H5125 (Aug. 4, 1989), stated:

> The bill repeals all benefits generally effective on January 1, 1990. However, to the extent that a beneficiary is receiving benefits under the bill on that date, the beneficiary is generally held harmless. *Id.*

Plaintiffs point to the phrase "under the bill", and read the comment as merely saying that there will *be* patients who receive benefits under the transition provision of *the Repeal Act* itself. Appellees' Brief at 40. Thus, in their view, Representative Donnelly devoted a sentence to explaining that persons who received benefits under the transition provision would receive benefits under the transition provision. Surely his colleagues did not need him to enable them to grasp that truth.[5] We think it more plausible that Representative Donnelly was communicating the thought that the transition provision protected patients who were receiving benefits under the Catastrophic Coverage Act at the moment of transition.[6]

---

**5.** Representative Donnelly went on to say:

> Thus, if a beneficiary was hospitalized in 1989, the days of hospitalization in that year are not treated as a spell of illness. In addition, a beneficiary who is hospitalized on January 1, 1990 will not have to pay a second deductible during that spell of illness.

135 Cong.Rec. H5125. Plaintiffs believe these two sentences support their view that *coverage* on December 31, 1989 is not essential for a patient to receive the benefits of § 101(b)(1)(C). But the first sentence clearly refers to the relation between the Catastrophic Coverage Act's 150–day rule and the revived spell-of-illness requirement, a grandfathering that, as we have explained, is for good reason independent of status on that date. The second sentence evidently refers to § 101(b)(1)(D)(i), which relieves

patients of a deductible triggered by each new spell of illness and uses language similar to that of § 101(b)(1)(C)—"an individual who is receiving inpatient hospital services during a continuous period beginning before (and including) January 1, 1990 ...." Plaintiffs assume, perhaps correctly, that this clause covers persons whose Catastrophic Coverage Act coverage had run out before year's end, but the context is quite different, as relief from the deductible is a natural extension of the pre-Catastrophic Coverage Act principle of imposing only one deductible for any single continuous period in a SNF.

**6.** After enactment of the Repeal Act, Representative Donnelly explained in a letter to Michael Astrue, General Counsel for the Department of Health and Human Services, his view of the transition provision. Donnelly Letter, Decem-

Similarly, Senator Roth explained: "To put it simply, this amendment repeals all current and future catastrophic benefits except for some transition rules that help accomplish repeal *in a manner that is not disruptive to individuals currently receiving benefits.*" 135 Cong.Rec. S12882 (daily ed. Oct. 6, 1989) (emphasis added). Plaintiffs explain this away by reading "currently" to refer to receipt of benefits any time in the then current year, i.e., the year covered by the Catastrophic Coverage Act. Appellees' Brief at 42. But it would be odd indeed to speak of "disrupt[ion]" for persons whose benefits clearly ended before December 31, 1989 and might well have ended in May. We find the Secretary's reading far more natural.

The Secretary also points to a remark of a Senate co-sponsor, Senator Coats: "The intent is to insure that no Medicare beneficiary will be forced out of a hospital room or nursing home bed due to repeal." 135 Cong.Rec. S12887 (daily ed. Oct. 6, 1989). This indeed seems to support the Secretary's reading of § 101(b)(1)(C), under which only persons whose presence in a SNF on December 31, 1989 was *not* supported by Medicare would be denied Medicare support by virtue of failing the post-hospital stay requirement. It seems a stretch to regard such a person, supported by alternative sources on December 31, 1989, as "forced out" by the Repeal Act's failure to *revive* benefits on January 1, 1990. Plaintiffs' counsel suggest that a patient may be "forced out" under the Secretary's reading, pointing to a plaintiff whose coverage ended before December 31, 1989 but who had "Medigap" insurance taking her through to year's end, but not covering the next year. Appellees' Brief at 43–44. But all this means is that Medigap coverage premised on plaintiffs' reading of the Repeal Act would prove incomplete under the Secretary's. Though perfectly true, the point hardly supports denying Senator Coats' statement the more apparent reading.

Finally, the Secretary rests in part on a one-page computer print-out, of which we

append a photocopy and which we will refer to as the "CBO Exhibit", although, in truth, its provenance is unclear. Footnote 1, which is flagged at a reference to $200 million for SNF costs in 1990, states: "SNF as Donnelly/Archer effective 1/1/90. Assumes that only 1990 transition SNF costs ($200 million) are funded by catastrophic premiums." Another line notes $900 million for 1990 SNF; as it is totalled with the prior reference to $200 million, we infer that the author saw the $900 million as additional to the "1990 SNF transition costs ($200 million)". J.A. at 85. Further, Representative Archer, urging enactment of repeal (with his transition provisions), argued that Congress could not, as a matter of politics or good policy, "transfer[ ] the cost of the program from the beneficiaries to the taxpayers." 135 Cong.Rec. H6584 (daily ed. Oct. 4, 1989). All this is connected to our problem by an affidavit by Solomon Mussey, Director of the Office of Medicare Cost Estimates, Office of the Actuary of the Health Care Financing Administration, stating that he had estimated transition SNF costs immediately after enactment, using first the Secretary's interpretation, then the one (later) adopted by plaintiffs. He estimated costs at $230 million under the Secretary's view, but at $690 million under the plaintiffs'. J.A. at 88–89. If Congress intended transition costs to be largely covered by unexpended Catastrophic Coverage Act premiums (apparently $200 million), a reading that will cost more than triple that amount is questionable.

We find the CBO Exhibit perplexing. Except for the probably computer-driven date and time, it has no caption. There is no clue what members of Congress might have received it. Further, the second reference to SNF costs estimates $900 million for 1990 and $300 million for each of the next two years; from this one might infer that *some* 1990 transition costs are to be borne by the taxpayer, with $300 million being the "regular" SNF costs, i.e., those to be expected to be incurred each year once the "transition" is over.

Surprisingly, appellees make none of these arguments. Instead, they point to

ber 21, 1989, J.A. at 86–87. Because of its post-enactment character, we attach no weight to the letter. *Multnomah Legal Services Workers Un-*

*ion v. Legal Services Corp.,* 936 F.2d 1547, 1555 (9th Cir.1991).

another CBO estimate, this one published ([1990 Transfer Binder] CCH Medicare & Medicaid Guide (CCH) ¶ 38,052), stating that *under the Catastrophic Coverage Act* 1990 SNF costs would have been about $2.5 billion in 1990. So, they say, even under their reading the Repeal Act saved about $1.7 billion. See Appellees' Brief at 45–46. Whatever the frailties of the Secretary's view of the CBO Exhibit, his inferences are not undermined by this. The Act repealed a large tax precisely because the targeted taxpayers found it burdensome, and sought to match the tax repeal with parallel expenditure reductions. In the face of evidence that under plaintiffs' reading the transition provision would cost more than *triple* the estimate, it is no answer to say that, even so, the Repeal would cost a lot less than the Catastrophic Coverage Act. Because of the vulnerabilities of the CBO Exhibit not raised by plaintiffs (perhaps not raised because there are good answers), we cannot give it much weight, but as plaintiffs raise only a frivolous objection, we believe it relevant and somewhat supportive of the Secretary.

\* \* \*

All of this takes us only to the conclusion that Congress has not "spoken directly to the precise question at issue". But the same circumstances that undermine plaintiffs' view that their literal reading represents Congress's "clear" intent, see *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781, also support the reasonableness of the Secretary's view: it is more in harmony both with traditional grandfathering notions and with the legislative history. Accordingly, the decision below is

*Reversed.*

McCain

11/17/89
01:50 PM

| PROVISIONS | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1990–94 TOTAL |
|---|---|---|---|---|---|---|---|
| **I. SPENDING** | | | | | | | |
| Hospital | 893 | 1293 | 1401 | 1522 | 1659 | 1803 | 7678 |
| SNF (1) | 0 | 200 | 0 | 0 | 0 | 0 | 200 |
| Home Health | 0 | 129 | 183 | 194 | 208 | 223 | 937 |
| Blood Deductible | 6 | 9 | 10 | 11 | 12 | 12 | 54 |
| Hospice | 1 | 1 | 1 | 1 | 1 | 1 | 5 |
| Part B Copay Cap | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Respite | 0 | 12 | 30 | 48 | 77 | 122 | 289 |
| Screening Mammography | 0 | 75 | 123 | 138 | 147 | 156 | 639 |
| Home IV/Immune Drugs | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Drugs | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Administrative Costs | 160 | 46 | 56 | 59 | 61 | 64 | 286 |
| Subtotal Spending | 1060 | 1765 | 1804 | 1973 | 2165 | 2381 | 10088 |
| SNF Spending | 900 | 900 | 300 | 300 | 400 | 400 | 2300 |
| TOTAL MEDICARE SPENDING | 1960 | 2665 | 2104 | 2273 | 2565 | 2781 | 12388 |
| **II. INCOME COMPONENT** | | | | | | | |
| Flat Premium | 1165 | 1790 | 1957 | 2044 | 2219 | 2397 | 10408 |
| Supplemental Premium (non-add) | 531 | −531 | 0 | 0 | 0 | 0 | −531 |
| TOTAL MEDICARE INCOME | 1165 | 1790 | 1957 | 2044 | 2219 | 2397 | 10408 |
| NET MEDICARE (Outlays–Income) | 795 | 875 | 147 | 229 | 346 | 384 | 1980 |
| NET MEDICARE WITHOUT SNF | −105 | −25 | −153 | −71 | −54 | −16 | −320 |
| **III. TRUST FUND INFORMATION(2)** | | | | | | | |
| Calendar Year Monthly Premium | $4.00 | $4.70 | $4.90 | $5.00 | $5.40 | $5.80 | |
| End of Year Balance | 197 | 199 | 346 | 406 | 467 | 512 | |
| Contingency Margin (EDY Balance/Same Year's Outlays) | 14% | 11% | 19% | 20% | 21% | 21% | |

SOURCE: CONGRESSIONAL BUDGET OFFICE, AUGUST BASELINE

(1) SNF as Donnelly/Archer effective 1/1/90. Assumes that only 1990 transition SNF costs ($200 million) are funded by catastrophic premiums.

(2) The premium is set to fully fund program costs with an appropriate contingency margin.

BUCKLEY, Circuit Judge, dissenting:

It is axiomatic that in interpreting a statute, a court must begin with its language. It should also be clear by now that when that language answers the question before the court, there is no need to go further: "[W]here ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). The question here is whether section 101(b)(1)(C) of the Medicare Catastrophic Coverage Repeal Act of 1989 ("Repeal Act") can be read to support the Secretary's effort to limit its coverage to only those persons who (1) received extended care services from a skilled nursing facility ("SNF") for a continuous period beginning before and including January 1, 1990 and (2) *also* received medicare benefits for those services on December 31, 1989 and January 1, 1990. As I find it cannot, I would affirm the district court's decision on the merits. I agree, however, with the panel's treatment of the district court's class certification order and would remand solely for the purpose of recertifying a proper class.

As my colleagues recognize, subsection (1)(C) of the transition provisions, standing alone, is not ambiguous. *See* Maj.Op. at 275–76. The subsection states:

(1) *Inpatient hospital services and post-hospital extended care services.—* In applying sections 1812 and 1813 of the Social Security Act, as restored by subsection (a)(1), with respect to inpatient hospital services and extended care services provided on or after January 1, 1990—

\* \* \* \* \* \*

(C) the limitation of coverage of extended care services to post-hospital extended care services shall not apply to an individual receiving such services from a skilled nursing facility during a continuous period beginning before (and including) January 1, 1990, until the end of the period of 30 consecutive days in which the individual is not provided inpatient hospital services or extended care services....

Pub.L. No. 101–234, § 101(b)(1)(C). On its face, the language "allows for only one reasonable construction." *Tataranowicz v. Sullivan*, 753 F.Supp. 978, 984 (D.D.C. 1990). The provision establishes just one requirement: an individual must have received extended care services from an SNF during the transition period. There is not the slightest intimation, in subsection (1)(C), that Congress intended to add the second part of the test imposed by the Secretary. Under the traditional analysis of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), because Congress "has directly spoken to the precise question" of who should benefit from the transition provision, the Secretary may not substitute his judgment for that of Congress.

I recognize that the Supreme Court has found ambiguity to exist in instances where a literal reading of a facially clear statute would conflict with a pre-existing "pervasive regulatory scheme," *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 24, 96 S.Ct. 1938, 1948, 48 L.Ed.2d 434 (1976), or where a provision is rendered ambiguous by other parts of the statute. See *McCarthy v. Bronson*, —— U.S. ——, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991). No such contradictions exist in this case, however, and the majority points to no precedent in which the Supreme Court or this court has found clear statutory language ambiguous on such slender reeds as the ones on which it relies.

My colleagues assert that the title heading preceding the transition provisions in the Repeal Act renders section 101(b)(1)(C) unclear. Section 101(b) is captioned: "Transition Provisions for Medicare Beneficiaries." They are, however, somewhat at a loss to explain how the presence of that caption makes subsection (C) any less clear. *See* Maj.Op. at 276–77 (clear meaning of the statute "creates at least some tension with the caption"). They also recognize that the term "beneficiaries" could refer to

anyone who was a beneficiary during 1989. *Id.* Their difficulty illustrates why a subheading should not be used to create ambiguity in statutory language. The Supreme Court has cautioned that

> [w]here ... text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner.... As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase.

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947) (citations omitted). *See also NRDC v. EPA,* 915 F.2d 1314, 1321 (9th Cir.1990) (statutory headings "cannot *create* an ambiguity where none otherwise would exist") (emphasis in the original); *cf. Utah Power & Light Co. v. ICC,* 747 F.2d 721, 727 (D.C.Cir.1984) (statutory title can indicate legislative intent where statutory term ambiguous). As the statutory language is clear, the caption is irrelevant.

Next, the majority suggests that the transition provisions are

> self-evidently devoted to special problems of transition back to the *status quo ante* the Catastrophic Coverage Act. Such grandfathering typically seeks to provide special relief for persons on whom the new regime might bear with unusual severity, because it specially disrupts their lives, usually because of decisions they are likely to have taken in reliance on the prior regime.

Maj.Op. at 277. Accepting that it is self-evident that the provisions "provide special relief" for those peculiarly affected by the change in regimes, the majority fails to explain why the plaintiffs do not fall within that purpose.

If the Catastrophic Coverage Act of 1988 had remained in force, individuals who had exhausted their 150 days of coverage in 1989 but remained in their SNFs would have begun receiving benefits again on January 1, 1990. That was their expectation at least until December 13, 1989, when the President signed the Repeal Act into law. It is beyond dispute that the elderly in our society must structure their use of medical services to take advantage of any source of financing. Many class members moved into SNFs in 1989 without spending three days in a hospital prior to admission. *See* Exhibits A and L to Plaintiffs' Reply to Defendant's Motion to Dismiss, *reprinted in* Joint Appendix at 31, 78–81; Exhibit A to Plaintiffs' Motion for Summary Judgment; Exhibit A to Plaintiffs' Motion and Memorandum for a Reduction of Time for Defendant to Respond to Complaint of Applicant for Intervention. At least one member of the class spent the requisite three days in a hospital, returned home for over thirty, and then moved to a nursing facility. *See* Exhibit A to Plaintiffs' Motion for a Reduction of Time. It appears that another relied on the availability of benefits for the first part of 1990 to trigger a "medigap" insurance policy that would then cover the remainder of the year. *See* Joint Appendix at 78–81; Brief for Appellees at 44.

The abrupt return to the old system certainly upset the planning of these individuals and would inflict a significant hardship on them. Rewriting subsection (1)(C) to exclude these persons would implicate the reliance factor that the majority views as the target of the transition provision. Thus, it is anything but self-evident that Congress would have wanted to deprive them of its benefits.

The majority nevertheless contends that this vision of congressional intent "seems broad in relation to conventional grandfathering goals." Maj.Op. at 277. Perhaps, then, Congress had broader purposes than the one the majority feels appropriate. Another transition provision, section

101(b)(1)(D)(ii), suggests that Congress sought to achieve more than "conventional grandfathering" as defined by the majority. Under that provision, the Social Security Act's inpatient hospital deductible would not apply "for a spell of illness beginning during January 1990, if such a deductible was imposed on the individual for a period of hospitalization that began in December 1989...." Pub.L. No. 101–234, § 101(b)(1)(D)(ii). This transition provision provides generous treatment for individuals who entered a hospital in December 1989, terminated their stay in that month, and then returned to a hospital in January 1990. Such individuals need not pay the annual deductible for 1990. Whatever the objective of that provision, it cannot be to "grandfather" a rule applicable to persons receiving medicare coverage for services at the time of the Repeal Act's passage.

The majority also derives ambiguity from the legislative history, placing particular reliance on statements from sponsors and cosponsors of various versions of the Repeal Act. Even when clear, however, such statements are unreliable guides to statutory meaning. "While a sponsor's statements may reveal *his* understanding and intentions, they hardly provide definitive insights into *Congress'* understanding of the meaning of a particular provision." *Overseas Educ. Ass'n, Inc. v. FLRA,* 876 F.2d 960, 975 (D.C.Cir.1989) (Buckley and Starr, JJ., concurring) (emphasis in original). As any viewer of C–SPAN knows, such explanations often fall on few, if any, ears.

Finally, the majority seeks support for its holding from a one-page computer printout that purports to give cost estimates of the Congressional Budget Office for the Repeal Act. My colleagues effectively undermine the value of this evidence, Maj.Op. at 279–280, yet they consider it "relevant and somewhat supportive of the Secretary," *id.* at 280, simply because appellees did not make the same arguments. I read appellees' brief, however, as questioning the relevance of the estimate and whether

any member of Congress relied on it. *See* Brief for Appellees at 44–45. In any event, we are not bound, when interpreting a statute, to rely on the arguments put before us by the parties. Indeed, the Secretary makes no claim, for example, that the transition provision serves "conventional grandfathering goals," yet the panel overturns the district court based, in part, on that argument.

Having reached the conclusion that Congress could not have meant what it clearly said, the majority has jerry-built the suggestion of a contrary intent out of "evidence" that, on examination, proves to be little more than attenuated inferences and speculation. More is required before a court can presume to rewrite a statute.