### NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,

v.

### UNITED STATES of America, Defendant.

### No. CIV.A. 03–431(RMC).

United States District Court, District of Columbia.

Sept. 20, 2004.

Dennis Merrill Moore, Amtrak Law Department, Jean Ann Pawlow, Miller & Chevalier, Chartered, Washington, DC, for Plaintiff.

David M. Katinsky, U.S. Department of Justice Tax Division, Washington, DC, for Defendant.

Stephen J. Rosen, Levine, Blaszak, Block & Boothby, LLP, David A. Clanton, Baker & Mckenzie, Washington, DC, for Movants.

## MEMORANDUM OPINION

COLLYER, District Judge.

When a defined term in the Internal Revenue Code ("Code"), 26 U.S.C. § 1 *et seq.*, fails to keep pace with technological advances and other changes in the commercial world, may the Internal Revenue Service ("IRS") nonetheless construe the Code to levy a tax arguably envisioned by Congress? This case concerns the proper interpretation and implementation of a federal excise tax on communications services. Finding that Congress meant what it plainly said in 1965, the Court concludes that only Congress, and not the IRS on its own, may update the statutory text. The motion for summary judgment filed by the United States ("IRS") will be denied and the National Railroad Passenger Corporation's ("Amtrak") motion for summary judgment will be granted.

### I.

Section 4251 of the Code imposes a three-percent excise tax on "communications services," which include "local telephone service" and "toll telephone service." [1] 26 U.S.C. § 4251(b)(1). "Local telephone service" means:

(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and

(2) any facility or service provided in connection with a service described in paragraph (1).

*Id.* § 4252(a). Specifically excluded from this definition is "any service which is a 'toll telephone service' or a 'private communication service' ...." *Id.* The Code describes "toll telephone service" as:

(1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid within the United States, and

(2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

*Id.* § 4252(b). Section 4253(f) provides that "[n]o tax shall be imposed under section 4251 on the amount paid for any toll telephone service described in section 4252(b)(2) to the extent that the amount so paid is for use by a common carrier ...." *Id.* § 4253(f). It is undisputed that Amtrak is a common carrier for purposes of § 4253(f).

By statute, Amtrak is tasked to "provide intercity and commuter rail passenger transportation that completely develops the potential of modern rail transportation to meet the intercity and commuter passenger transportation needs of the United States." 49 U.S.C. § 24101(b). "Amtrak serves more than 500 stations in 46 states over more than 22,000 route miles." Pl.'s Mot. at 3. In fiscal year 2002, Amtrak transported approximately 23.4 million passengers utilizing its rail services. The United States, through the Department of

---

1. A third type of "communications service" is "teletypewriter exchange service," which is not relevant here. Mem. of Pts. & Auths. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 9 n. 4.

Transportation, owns 100% of Amtrak's preferred stock.

In April 2002, Amtrak paid federal communications excise taxes to the IRS in the amount of $86,103.28, and timely filed a Form 720, Quarterly Federal Excise Tax Return, for the first quarter of the 2002 calendar taxable year. On May 17, 2002, Amtrak submitted to the IRS a claim for refund of the full amount of excise taxes it had paid in the previous month. This claim satisfied the requirements of §§ 6532 and 7422 of the Code. The IRS has neither allowed nor denied Amtrak's claim for refund. Amtrak filed this civil action after waiting six months from the filing of its claim.

Amtrak's federal communications excise taxes for the first quarter of 2002 were calculated based on the sums that Amtrak paid to International Business Machines Corporation ("IBM") during that time period for providing the following four types of telecommunications services: (i) domestic inbound toll-free dedicated service; (ii) Canada inbound toll-free service; (iii) domestic inbound "Switched" or "Ready–Line" service; and (iv) virtual network service (collectively, "Amtrak's telecommunications services").[2] IBM's monthly bills

2. Amtrak's domestic inbound toll-free telephone service allows its customers to initiate telephone calls from anywhere in the continental United States, Alaska, Hawaii, Puerto Rico, and the United States Virgin Islands at no cost to the calling party. A customer reaches Amtrak by dialing the toll-free ("800," "888," "877," or "866") number. The call is then transmitted over the customer's local telephone system and connected with a communications system operated by an Interexchange Carrier ("IXC"), e.g., AT & T, MCI, or Sprint. Amtrak outsources contracts for these services to IBM, which chooses and manages the IXC to supply end-to-end toll-free services. The IXC carries the call—using copper cable, microwave transmission, satellite communication, fiber-optic cable, or combination thereof—to the central office of the telephone carrier serving the call center or Amtrak office being called. The call is completed over a leased dedicated access line. All calls under this service are transported in the same fashion.

Amtrak's Canada inbound toll-free service allows its customers to initiate telephone calls from anywhere in Canada at no cost to the calling party. This service operates in a manner identical to Amtrak's domestic inbound toll-free service. The IXC service described above permits calls originating in Canada to be connected to Amtrak's offices using the same IXC network and terminating on both dedicated access lines and switched lines.

Amtrak's "Switched" or "Ready–Line" service is a toll-free service designed for low-usage applications, which allows its customers to initiate telephone calls from anywhere in the continental United States, Alaska, Hawaii, Puerto Rico, and the United States Virgin Islands at no cost to the calling party. Amtrak's use of "Ready–Line" service is limited to very low call volume applications not handled by its nationwide call center network. This service permits Amtrak to receive toll-free inbound calls on its existing local telephone lines and equipment at no charge to the calling party. This service requires no new lines or equipment to be installed. Inbound toll-free ("Ready–Line") calls "mix" with other types of incoming calls (e.g., local calls) and are transported on the same telephone circuits and hardware used for the domestic inbound toll-free dedicated and Canada inbound toll-free services. As with Amtrak's domestic inbound toll-free service, Amtrak outsources this service through IBM for vendor selection and management.

Amtrak manages calling and associated expenses by using a telephone calling network that is software programmed. Also known and sold to subscribers as a "Software Defined Network" ("SDN"), this service is "virtual" in the sense that it does not require any of the IXC's telephone network transmission circuits to be dedicated solely to Amtrak. The SDN service entitles Amtrak to the use of groups of communications channels and an intercommunication system that permits Amtrak employees to make calls to and from the various Amtrak business locations. All telephone stations on Amtrak's SDN are assigned a unique seven-digit number, which Amtrak uses internally; these numbers are not the same as the numbers listed in the public telephone book. When an Amtrak employee

to Amtrak for January, February, and March 2002 reflect separate charges for each of these four telecommunications services. Amtrak's monthly toll charges were determined by multiplying the aggregate number of resource units, *i.e.*, number of minutes, for a particular service by the specific rate that applied to that service— that is, monthly charge for each service = aggregate monthly resource units (minutes) for that service × service-specific rate. All of the monthly toll charges were paid within the United States. Under the Services Agreement with IBM, Amtrak was entitled to make and receive an unlimited number of telephone calls.

## II.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This procedural device is not a "disfavored legal shortcut" but a fair and efficient method of resolving cases expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994).

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment .... [S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III.

Amtrak asserts that it is entitled to a refund of $86,103.28 on the grounds that the telecommunications services in question fit within the scope of § 4252(b)(2) and that the amounts paid for them are exempt from taxation under § 4253(f). The IRS, on the other hand, contends that these services are taxable as "a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance *and* elapsed transmission time of each individual communication[,]" 26 U.S.C. § 4252(b)(1) (emphasis added), despite the fact that none of the charges for Amtrak's telecommunications services varies by distance.[3] In support of this

---

places a toll call from one of Amtrak's business locations, the call is sent over a dedicated local access line to the IXC. The system analyzes the call to determine whether the call is an "on-net" or "off-net" call, and a path is set up over which the call will be rerouted using the SDN. On-net calls stay on Amtrak's SDN service from call origination to completion; off-net calls are carried in part by Amtrak's SDN service and in part by the Public Switched Telephone Network and may either originate or terminate at a telephone not on Amtrak's SDN service. Using an SDN allows Amtrak to limit and control off-net calling through the use of personal authorization codes assigned to individual employees.

In order to complete an off-net call, the SDN prompts the caller to input his or her assigned authorization code before the call can be completed. As with Amtrak's domestic inbound toll-free service, Amtrak outsources SDN service through IBM for vendor selection and management.

3. In a footnote, the IRS suggests that IBM's rate "could be said to vary with the distance of the individual calls." Def.'s Mem. of Pts. & Auth.'s in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Opp.") at 14–15 n. 11. This point was not fully briefed by the parties and the Court assumes for purposes of the cross motions

reading, the IRS points to legislative history that purportedly evinces Congress's desire to tax *all* individually-charged long-distance calls and Revenue Ruling 79–404, which interpreted § 4252(b)(1) "as not requiring variance by distance in order for a telephone call to fall under its provisions." Def.'s Opp. at 10–11. The IRS argues in the alternative that, if Amtrak's telecommunications services are not long-distance "toll" calls, then they should be taxed as local telephone service calls under § 4252(a).

**A.**

At first glance, the question of how to interpret § 4252(b)(1) appears complex. The IRS insists that "[t]he wording of § 4252(b)(1) is not clear-cut or meaningful"[4] and urges the Court to delve deeper to ascertain congressional intent. Mem. of Pts. & Auths. in Supp. of United States of Am.'s Mot. for Summ. J. ("Def.'s Mot.") at 9. A careful review of both the statute's plain language and legislative history, however, establishes that Amtrak's telecommunications services do not satisfy the requirements of § 4252(b)(1) as drafted by Congress.

As an initial matter, the text of § 4252(b)(1) unequivocally states that a particular communications service can constitute "toll telephone service" only if, *inter alia*, "there is a toll charge which varies in amount with the distance *and* elapsed transmission time of each individual communication ...." 26 U.S.C. § 4252(b)(1) (emphasis added). Under a strict reading of this provision, the telecommunications services offered by IBM would not amount to "toll telephone service" because their pricing is not dependent on distance.[5] The IRS does not really contest this point, instead focusing on why the Court should construe "and" to mean "or" (so that the definition is fulfilled when a toll charge varies in amount with distance *or* time).

According to the IRS, the Code's legislative history shows that Congress intended to tax all individually-charged long-distance telephone calls under § 4252(b)(1). Def.'s Mot. at 10. "Section 133 of the Excise Tax Technical Changes Act of 1958, Pub.L. No. 85–859, 72 Stat. 1275 (1958), defined 'toll telephone service' as 'a telephone or radio telephone message or con-

---

that distance is not a component of the charges for these services.

4. The IRS asserts:

> The provision refers to a charge for a telephonic quality communication varying with the distance and elapsed transmission time of the call. Literally, however, a charge—an 'expense or cost'—must be expressed in dollars and cents, and any variance would be in dollars and cents. · It cannot vary with a unit of distance or a unit of time. Thus, read literally, Congress would tax nothing under § 4252(b)(1), an absurd result. Similarly, there is ambiguity in the fact that § 4252(b)(1) speaks of an individual communication and an individual toll charge but then speaks to a variance. Technically, it is impossible to have a variance in an individual statistic. Thus, it must be con-

ceded that there is no true literal reading of § 4252(b)(1).

*Id.* (citation omitted). *See also id.* at 2 (The statute "speaks of a 'charge'—which must be expressed in money—varying with distance and time: an impossibility."). This argument obfuscates the plain and simple meaning of the statutory text, which is clearly described by the IRS. *Id.* at 18.

5. IBM employs what it calls a "postalized" fee structure. Decl. of Bradford M. Burch ¶ 9. It is so named because, like a letter mailed through the United States Postal Service, the charge is the same whether the call is transmitted across town or across the country. According to the IRS, the "postalized" rate for telephone service is increasingly popular and has spawned other lawsuits concerning the applicability of § 4252(b)(1). Def.'s Mot. at 18 n. 5.

versation for which (1) there is a toll charge, and (2) the charge is paid within the United States.'" *Id.* at 11. The IRS asserts that the language in § 4252(b)(1) "is equivalent to th[is] pre–1965 definition" and simply "reflects a congressional effort to describe the method for computing individually-charged long-distance telephone charges in 1965[,]" when "charges for such calls varied among calls of different temporal lengths" and distance. *Id.* at 12, 17–18.

The Court agrees with the IRS that there may be times when "and" should be construed as "or," or vice versa, to give effect to the clear intention of the legislature. *See* Def.'s Mot. at 19. In this case, however, the plain language of § 4252(b)(1) accurately conveys what Congress sought to achieve in 1965. As the IRS itself states:

> [I]t is apparent that Congress intended to tax telephone service if it [were] of a type for which a charge could vary with elapsed time and distance under AT & T's pricing plan. The two components of the ultimate charge under AT & T's pricing plan were the elapsed time of the call and the rate per minute. The two would be multiplied together to obtain the 'charge' and it was that charge that had to be capable of varying with elapsed time and distance to bring the type of telephone call within the statute.

*Id.* at 18. The Court has no doubt that Congress specifically intended to use "and" rather than "or" in § 4252(b)(1)(A) to reflect the technology of the day. This is not an instance in which the legislature was imprecise or mistakenly selected the wrong word. Both time *and* distance determined the charge for individual long-distance telephone calls in 1965, and Congress's definition under § 4252(b)(1) mirrored that fact. For better or worse, Congress chose to define "toll telephone service" in a way that, in hindsight, may

be considered ephemeral. Whether this decision was short-sighted is beside the point. It is not the role of an administrative agency to question the wisdom of (constitutionally-sound) legislative policies. Congress certainly could have retained the generous 1958 definition of "toll telephone service" but thought it best to be more exact. While the requirements of § 4252(b)(1) may be too narrow to encompass many of today's telecommunications packages, that is not due to an inherent flaw in the statutory language. Congress wrote what it intended and what it intended made eminent sense for the time period. For these reasons, the IRS's argument that the Court should construe "the distance *and* elapsed transmission time" to mean "the distance *or* elapsed transmission time" lacks force. Congress clearly meant for "and" to be read in the conjunctive in § 4252(b)(1)(A) to be consistent with AT & T's pricing practices in 1965. *Office Max, Inc. v. United States*, 309 F.Supp.2d 984, 995 (N.D.Ohio 2004). *But see Am. Bankers Ins. Group, Inc. v. United States*, 308 F.Supp.2d 1360 (S.D.Fla. 2004).

The legislative history of the Excise Tax Reduction Act of 1965, Pub.L. No. 89–44, 79 Stat. 136 (1965), indicates that Congress knows how to update the Code to fit a changing landscape. In 1965, Congress amended the excise tax on communications services to exclude "private communications services" and to include Wide Area Telephone Service ("WATS"), the newest technology at the time, within its purview. *Compare* 26 U.S.C. § 4252(b)(1) (defining a "telephonic quality communication") *with* 26 U.S.C. § 4252(b)(2) (defining a "service"). As such, if the statutory language no longer fits the infrastructure of the industry, the IRS needs to ask for congressional action to bring the statute in line with today's reality. It cannot create an ambiguity that does not exist or misin-

terpret the plain meaning of statutory language to bend an old law toward a new direction.[6]

**B.**

Regardless of whether these telecommunications services fall under § 4252(b)(1), Amtrak asserts that they would not be taxable if they fulfill the meaning of § 4252(b)(2).[7] Section 4253(f) exempts from taxation under § 4251 the amount paid for use by a common carrier of any toll telephone service described in § 4252(b)(2).

The IRS argues that "Congress drafted § 4252(b)(2) purely to cover WATS service" and notes that

[Amtrak's] telephone services have two significant differences from WATS:

(1) there is no flat monthly fee charged Amtrak for an unlimited number of calls or a certain number of hours before further charges for additional hour commence; and

(2) in contrast to Amtrak, which has the Interexchange Carrier measure the duration of each call and report it to Amtrak, WATS does not measure individual calls, thus eliminating timing, processing, and billing expenses.

Def.'s Opp. at 19, 20. While acknowledging that "[t]he legislative history ... indicates that section 4252(b)(2) of the Code was intended to include WATS ... as it existed in 1965[,]" Amtrak remarks that "all four of [its] toll telephone services are described by the plain language of section 4252(b)(2) of the Code."[8] Pl.'s Mot. at 19. The fact that Amtrak's telecommunications services comport with a mechanical reading of the statute, however, is not dispositive when legislative history sheds light on the true meaning of terms. *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1180 (D.C.Cir.1995) ("[E]ven where the language of a statute is 'superficially clear, legislative history may call such apparent clarity into question.'" (quoting *Tataranowicz v. Sullivan*, 959 F.2d 268, 277 (D.C.Cir.1992))).

The Court agrees with the IRS that Congress did not intend § 4252(b)(2) to cover Amtrak's telecommunications services.[9] Amtrak's designated expert,

---

**6.** The Court is unpersuaded by the reasoning in Revenue Ruling 79–404, which cannot overrule a clear statutory requirement. *See Del Commercial Props., Inc. v. Comm'r of IRS*, 251 F.3d 210, 214 (D.C.Cir.2001) ("We accord [revenue] rulings *Skidmore* deference—that is, they are entitled to respect to the extent they have the power to persuade." (internal quotation marks omitted)).

**7.** The IRS contends that "a long-distance service and the phone calls made under it can fall under *both* § 4252(b)(2) and (b)(1)." Def.'s Opp. at 23 n. 16 (emphasis in original).

**8.** Amtrak states:

Congress was forward-looking when it drafted the definition in section 4252(b)(2) of the Code .... [T]he language contained [therein] specifically describes bulk-rate service "to *or from* all ... persons in a specified area ..." (emphasis added) even though WATS as it existed in 1965 was only

an outbound service. Inbound WATS was not introduced until 1967. Thus, in drafting the 1965 modifications to the Code, Congress anticipated that section 4252(b)(2) of the Code would, in time, apply to a bulk-rate service for receiving, as well as originating, long-distance telephone calls ....

Pl.'s Mot. at 19. The IRS's designated expert, Allen Buckalew, "traces the introduction of 'inward WATS' to 1965, the year § 4252(b)(2) was drafted." Def.'s Reply to Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 12 n. 10.

**9.** On earlier occasions, the IRS seems to have taken an inconsistent position on the scope of this provision.

Indeed, the IRS itself has construed the language of section 4252(b)(2) of the Code broadly in order to tax "WATS-like" services. *See* Priv. Ltr. Rul. 91–08–002 (Nov. 1, 1990) (holding that services "similar to

Bridger Mitchell, explains how WATS worked in 1965:

> "Full-time WATS" charged a flat monthly rate for an unlimited number of calls and minutes from the subscriber's location to any telephone located in one of six progressively larger service areas of the 'continental' 48 U.S. states. The second pricing plan, "measured-rate WATS," charged a lower flat monthly rate for up to 15 hours of calling, plus a further charge for each additional hour; as with full-time WATS, measured-rate WATS calls could be dialed to any telephone in one of the six U.S. service areas.

Exp. Rep. of Bridger M. Mitchell at 7–8. Central to both schemes was the bulk purchase of call time (either unlimited or up to 15 hours), which the subscriber would presumably "use or lose," for a fixed price. As Mr. Mitchell notes, "the legislative history of the 1965 amendment to the Code refers explicitly to WATS as 'a long-distance service whereby, for a flat charge, the subscriber is entitled to make unlimited calls within a defined area (sometimes limited as to the maximum number of hours).'" *Id.* at 8 (quoting H.R. Rep. No. 89–433 (1965); S. Rep. No. 89–324 (1965)). Therefore, the reference to "total elapsed transmission time" in § 4252(b)(2)—as a second definition of "periodic charge"—merely takes into account the potential for overage fees in "measured-rate WATS." *See* Def.'s Reply at 12; Exp. Rep. of Bridger M. Mitchell at 9 ("In 1965, there were no other generally available tariffs/rate plans that are described by 'total

elapsed transmission time' other than the WATS measured-rate plan."). The term was not intended to cover "telephonic communications" that are billed based *entirely* on elapsed time (with no flat-fee component); in 1965, that type of long-distance call would more appropriately fall under § 4252(b)(1).

In addition, Amtrak's telecommunication services do not really provide "an unlimited number of telephonic communications" as that phrase was contemplated by Congress. Literally, of course, Amtrak's customers may make unlimited telephone calls under the Services Agreement. Every call, however, increases the amount of the monthly bill.[10] Viewed in that light, virtually any service—telecommunications or otherwise—could be considered "unlimited" provided the seller has sufficient resources and the buyer does not run out of money. The services offered by IBM do not afford Amtrak "the privilege of an unlimited number of telephonic communications" for purposes of § 4252(b)(2) because Amtrak must pay for each telephone call (aggregated into the monthly minutes used).

### C.

As an alternative argument, the IRS argues that Amtrak's telecommunications services "must have been 'local telephone services' under Section 4252(a) [because] Congress demonstrated an intent to make taxable—subject to potential exemptions under § 4253—all telephone service, with the limited exception of 'private communications service' as defined in Section

---

the WATS service" were taxable "even though such services were not in existence at the time Congress enacted a specific section of the Code taxing WATS."); Gen. Couns. Mem. 39, 210 (Apr. 13, 1984) (construing section 4252(b)(2) broadly). Def.'s Opp. at 20. *See also id.* at 21 n. 11. These records are not binding on the IRS.

10. Amtrak's monthly minutes are the aggregate of all of the individual long-distance call minutes. "Amtrak insists on receiving reports detailing all calls and call durations." Def.'s Opp. at 14.

4252(d)." Def.'s Mot. at 29. As the IRS recognizes, the only way to so construe § 4252(a) would be to take an exceptionally broad reading of "local." The IRS asserts, "This apparent limitation is actually no limitation at all because, as Congress itself recognized, there is no legal reason why 'local' service could not be expanded to cover the entire nation, as occurred here.'" *Id.* at 30.

The Court declines to adopt the IRS's liberal construction of § 4252(a). It is inconceivable that Congress considered a nationwide telecommunications network to be "local." The text of the statute belies such an interpretation. Section 4252(a) explicitly provides that "local telephone service" does not include any service that is "toll telephone service." To define "local" as encompassing the United States would cause § 4252(a) to overlap with § 4252(b), particularly since § 4252(b)(2) involves telephonic communications "outside the local telephone system area in which the station provided with the service is located." 26 U.S.C. § 4252(b)(2).

### IV.

Amtrak's telecommunications services are not defined in § 4252(a)-(c) and therefore may not be taxed pursuant to § 4251. Amtrak's motion for summary judgment will be granted and the IRS's motion for summary judgment will be denied. Judgment against the IRS will be entered in the amount of $86,103.28, representing Amtrak's overpayment in federal communications excise taxes for the first quarter of calendar year 2002, and for any interest thereupon as provided by law. A separate order accompanies this memorandum opinion.

### ORDER

For the reasons stated in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that [18] motion for summary judgment is **GRANTED.** It is

**FURTHER ORDERED** that [19] motion for summary judgment is **DENIED.** It is

**FURTHER ORDERED** that **JUDGMENT** against Defendant is entered in the amount of $86,103.28, representing Plaintiff's overpayment in federal communications excise taxes for the first quarter of calendar year 2002, and for any interest thereupon as provided by law. It is

**FURTHER ORDERED** that this is a final appealable order. *See* FED. R. APP. P. 4(a).

**SO ORDERED.**